Jerry JACOBS et al., individually and on behalf of all others similarly situated, Plaintiffs,

v.

OSMOSE, INC., et al., Defendants.

No. 01–944–CIV.

United States District Court, S.D. Florida.

Feb. 25, 2003.

Tod N. Aronovitz, Aronovitz & Associates, P.A., Miami, FL, Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, P.C., Chestnut Ridge, NY, David McCrea, McCrea & McCrea, Bloomington, IN, Jerry Schumm, Buckland & Schumm, Bellingham, WA, Gary E. Mason, The Mason Law Firm, Washington, DC, for Plaintiffs.

Robert L. Shuftan, David A. Kanter, Brent R. Austin, Wildman, Harrold, Allen & Dixon, Chicago, IL, Lawrence D. Silverman, Stanley H. Wakshlag, Akerman, Senterfitt, Miami, FL, for Defendants, Osmose, Inc., Hickson Corporation, Hickson (USA) Corp., Hickson International, PLC, Arch Wood Protection, Inc. and Arch Chemicals, Inc.

John McNaughton, Robert P. Alpert, Seslee S. Smith, Morris, Manning & Martin, LLP, Atlanta, GA, Edward A. Moss, Shook, Hardy & Bacon, Miami, FL, Rebecca J. Schwartz, John K. Sherk, Shook, Hardy & Bacon, LLP, Kansas City, MO, for Home Depot, U.S.A., Inc.

Peter M. Kramer, Andre J. Zamorano, Steel, Hector, & Davis, LLP, Miami, FL, Benjamin G. Chew, Edward S. Wisneski, Andrew Zimmitti, Patton Boggs, LLP, Washington, DC, for American Wood Preservers Institute.

Nicolas Swerdloff, Hughes Hubbard & Reed, LLP, Miami, FL, Robb W. Patryk, Renee C. Redman, Hughes Hubbard & Reed, LLP, New York City, for Chemical Specialties, Inc.

### ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

MIDDLEBROOKS, District Judge.

### I. Introduction

THIS CAUSE comes before the Court upon Plaintiffs Jerry Jacobs, Charles Wit-

trock, Terry Sleep and Larry Sleep's Motion for Class Certification (DE # 233). The Motion has been fully briefed and is ripe for resolution. After consideration of the Record, the parties' lengthy submissions, and the oral arguments presented on February 18, 2003, it is the Court's determination that Plaintiffs' Motion should be denied.

## II. Background

Plaintiffs Jerry Jacobs and Ronald Sabel are residents of Miami–Dade County, Florida. Plaintiffs Sherry and Charles Wittrock are residents of Maple Valley, Washington. Plaintiffs Terry and Larry Sleep are residents of Grand Ledge, Michigan. According to the Plaintiffs, Defendants Osmose, Inc. ("Osmose"), Hickson (USA) Corp. ("Hickson"), and Chemical Specialties, Inc. ("CSI") (collectively, "the Formulator Defendants") manufacture a preservative known as chromated copper arsenate ("CCA"), discussed more in detail below.[1] Defendant American Wood Preservers Institute ("AWPI") is a trade organization. Home Depot U.S.A., Inc. ("Home Depot") is a national retailer of lumber, hardware, and construction products.

### A. CCA Treated Wood

Treated wood has been used in construction since its development in its 1930s. Typical structures to feature the wood include outdoor decks, playground equipment, walkways, joists, beams, and posts in home construction. Defendants state that there are eleven major formulators of CCA; three are named as parties in this matter. The wood treatment is multi-tiered and somewhat decentralized. Formulators design and sell the preservative to any of approximately 300 "treaters" who impregnate the wood through a procedure which infuses a liquid solution containing CCA into the wood. This process provides the wood with possibly several decades of protection from decay, termites and other insects, fungi, dry rot, and marine borders. Treaters then sell the finished product to a diverse body of clients: retail outlets (such as Home Depot), lumber yards, independent contractors, wholesalers, highway departments, railroads, builders, municipalities, utility companies, and others, who either use the products or sell them to end users. Treated wood is widely used in this country; Plaintiffs state that in 1997, 467 million cubic feet of treated wood were sold, representing nearly a fifth of all softwood boards and timbers sold.

### B. The Registration Process

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") requires all pesticides and fungicides to be registered with the U.S. Environmental Protection Agency ("EPA"). See 7 U.S.C. § 136(a) (2002). All registration applicants under FIFRA must demonstrate that their preservative performs its intended function without causing "unreasonable adverse effects on the environment." 7 U.S.C. § 136(c)(5)(D) (2002). To meet this standard, the registrant must show that the benefits of the preservative's use exceed its risks. Id. at 136(bb).

Pesticides registered with the EPA are subject to a periodic review process, under which the EPA maintains a "rebuttable presumption against re-registration" ("RPAR"). Registrants must overcome that presumption for their pesticides to remain on the market. Plaintiffs allege that Defendants have "lobbied intensely" against the RPAR proceeding and in favor of its termination. Further, Plaintiffs allege that Defendants' lobbying eliminated mandatory labels on treated wood products about the toxic effects of arsenic. Nevertheless, the EPA adopted new measures to protect wood treating workers using CCA, and also instituted a voluntary consumer awareness program ("CAP") for wood treaters to provide and distribute Consumer

---

**1.** Defendants state that only the companies Arch Wood Protection, Inc. ("Arch Wood"), Osmose, and CSI formulate CCA and that the remaining companies named in the Complaint have nothing to do with the formulation of CCA. According to Defendants, Arch Wood is an indirect subsidiary of Arch Chemicals, Inc., which does not formulate CCA, does not treat wood, and does not sell either CCA preservative or treated wood. Also according to Defendants, Hickson has never formulated CCA, manufactured treated wood, or sell CCA or CCA treated wood. Hickson nevertheless joined in the non-Home Depot Defendants' Memorandum opposing class certification. Finally, Hickson Corporation, another named party, became Arch Wood Protection, Inc. in December, 2000.

Information Sheets ("CIS") to lumber yards and retail outlets. *See* 51 Fed.Reg. 1334, Jan. 10, 1986.

The EPA recently has undertaken a new review of CCA as part of its continuous re-registration process. All pesticides first registered before 1984, like CCA, must undergo this review to ensure that they meet current safety standards. 7 U.S.C. 136a–1(a) (2003). The EPA has required CCA registrants to submit additional data, including information regarding exposure to treatment plant employees, to better evaluate human and environmental risks. Once its re-registration process is complete, EPA will issue a "re-registration eligibility decision" and explain its findings and conclusions regarding the continued use of CCA. *Id.* at § 136a–1(g).

### C. The Safety of CCA Treated Wood

Defendants state that the CIS has been available since 1986, containing EPA-approved language advising consumers that treated wood is preserved with "an EPA-registered pesticide containing inorganic arsenic to protect it from insect attack and decay." The disclosure apparently cautions that "[w]ood treated with inorganic arsenic should be used only where such protection is important" and advises that "inorganic arsenic penetrates deeply into and remains in the pressure-treated wood for a long time," but that "[e]xposure to inorganic arsenic may present certain hazards." In 2001, the CIS disclosures were expanded to provide specifically that "some chemical may migrate from treated wood into surrounding soil over time and may be dislodged from the wood surface upon contact with the skin."

In addition, the CIS contains precautions on the handling, use, and disposal of treated wood, advising consumers about, for example, the proper disposal of treated wood sawdust. It also cautions against the use of treated wood in silage containers, cutting boards or countertops, beehives, or places in which the wood could come in contact with drinking water. *See* 51 Fed.Reg. 1334 (Jan. 10, 1986). In addition, the CIS contains directions for working with the wood. For instance, it directs users to dispose of wood by either discarding or burying it, or to wash their hands thoroughly after sawing or machining it. *See id.* Defendants also state that end-tags detailing safe handling procedures contained much of the same information listed in the CIS. Such tags also advised purchasers to ask dealers for warranty information and handling guides.

This dispute focuses largely on both whether CCA treated wood is actually unsafe, and whether Defendants' conduct in promulgating warnings was sufficient. Defendants maintain that treated wood is perfectly safe when used and maintained properly. According to Defendants, arsenic, chromium, and copper (the three elements found in CCA) are mineral elements found (at least in traces) in all soils. Further, as Defendants add, arsenic is also routinely found in food and water, and a study found that consumption of inorganic arsenic in food ranged up to 124 micrograms per day-approximately fourteen times higher than estimates of the reasonable maximum arsenic exposure levels an average individual might experience from treated wood. *See* Teresa S. Bowers Aff. at 11–12. Defendants stress these points in support of the principle that many "toxic" substances are harmless at low levels.

Further, Defendants suggest that the scientific community has already considered the possibility that CCA-treated wood could potentially release enough arsenic to present a health risk. However, Defendants assert, many respected scientists have found no evidence to support the notion that, even after decades of its use, CCA poses a genuine health risk.

In stark contrast, Plaintiffs argue that exposure to CCA treated wood poses a risk of "extreme" injury and harm to humans, ranging from (in the event of poisoning) fever to severe crippling, kidney damage, and central nervous system dysfunction. In the Complaint, Plaintiffs list numerous reported instances of humans and livestock being severely injured or harmed by exposure to the elements in treated wood.[2] (*See* Compl. ¶ 68.)

---

2. Plaintiffs' position has gathered recent support in the national press, following a February 7,

In addition, Plaintiffs point to a 2000 study by the State University System of Florida's Center for Solid and Hazardous Waste Management. That study found, *inter alia*, that "CCA-treated wood leaches enough arsenic to routinely fail the U.S. EPA's toxicity levels," and that "[t]he overall results of the study indicate that CCA-treated wood does impact the environment during its service life by increasing the metal concentrations of soil." The study also estimated the amount of treated wood locally at 26,800 tons, "enough to increase the arsenic concentration of a volume of water equal to 130 times the size of Lake Okeechobee by 50 μg/L, which is the federal drinking water limit." (*See* Compl. at 21–23.)

### D. The Class Action Allegations

On March 4, 2002, Plaintiffs filed an Amended Class Action Complaint, proposing a class with two subclasses of all persons within the United States who, between 1981 and the present, fall within the following descriptions:

Class I: Owners of property who have existing upon or installed or constructed upon their property during the Class Period: Treated Wood Products, including playground equipment, playset equipment and/or decking constructed of CCA Pressure Treated Wood, which has been designed, manufactured, marketed, distributed or sold by any of the Defendants and/or their affiliates, agents, or representatives;

Subclass I(a): Owners of property who have existing upon or installed or constructed upon their property during the Class Period: Treated Wood Products, including playground equipment, playset equipment and/or decking constructed of CCA Pressure Treated Wood which has been designed, manufactured, marketed, distributed or sold by any of the Defen-

dants and/or their affiliates, agents or representatives and who purchased the Treated Wood at Defendant Home Depot's retail outlet;

Subclass I(b): Owners of property who have existing upon or installed or constructed upon their property during the Class Period: Treated Wood Products, including playground equipment, playset equipment and/or decking constructed of CCA Pressure Treated Wood which has been designed, manufactured, marketed, distributed or sold by any of the Defendants and/or their affiliates, agents or representatives and who purchased the Treated Wood at any retail outlet other than Home Depot outlet.

The Complaint brings causes of action for strict liability, negligence, public and private nuisance, civil conspiracy or concert of action, breach of implied warranty (against Hickson, Osmose, and Home Depot), violation of § 04(a) of the Magnuson–Moss Consumer Products Warranties Act, 15 U.S.C. § 2301, *et seq.*, and state consumer protection laws.

## III. Plaintiffs' Motion for Class Certification

■ The initiation and maintenance of a class action is governed by Rule 23 of the Federal Rules of Civil Procedure. This rule places upon the proponent of certification the burden of proving its entitlement to class certification. *See Brooks v. Southern Bell Telephone and Telegraph Co.*, 133 F.R.D. 54, 56 (S.D.Fla.1990). To meet its burden, the proponent must satisfy not only all of the prerequisites of Rule 23(a), but it also must satisfy at least one of the alternative requirements of Rule 23(b). The proponents here seek certification under Rule 23(b)(3). The court is vested with broad discretion in determining whether to certify the class. *See Washington v. Brown and Williamson To-*

2003 report by the Consumer Products Safety Commission that stated that while there is no reason to remove existing playground structures that contain CCA, children who play on CCA-treated playgrounds could face an increased risk of illness. Specifically, the report projected that between two and 100 children of every million who play on such equipment would get bladder and lung cancer from exposure to arsenic. Gen-

erally, the threshold of disease for government concern over toxins is one in one million being affected. *See* Jennifer 8. Lee, *Government Report Says Wood Playsets Pose a Cancer Risk*, N.Y. TIMES, Feb. 8, 2003, at A14; Caroline E. Mayer and Martha McNeil Hamilton, *Agencies Studying Cancer Risk of Play Sets*, WASH. POST, Feb. 8, 2003, at E01.

*bacco Corp.,* 959 F.2d 1566, 1569 (11th Cir. 1992).

## A. Numerosity

■ Rule 23(a) requires that "the class [be] so numerous that joinder of all members is impracticable . . . ." "Impracticable," however, does not mean "impossible." *Gomez v. Illinois State Bd. of Ed.,* 117 F.R.D. 394, 399 (N.D.Ill.1987). To satisfy the requirement, a plaintiff need not specify an exact number of class members, but must show only that joinder is impracticable. Practicability depends on many factors, including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined, and their geographic dispersion. *See Hammett v. American Bankers Ins. Co.,* 203 F.R.D. 690, 694 (S.D.Fla.2001). The numerosity requirement achieves judicial economy, while preventing members of a small class from being unnecessarily deprived of their rights without a day in court. *Rippey v. Denver U.S. Nat'l Bank,* 260 F.Supp. 704, 712 (D.Colo.1996).

■ The law does not require that a plaintiff establish the exact number of class members. *See Barlow v. Marion County Hosp. Dist.,* 88 F.R.D. 619, 625 (M.D.Fla.1980); a court may make "a good faith estimate of the number of class members." *Gomez,* 117 F.R.D. at 399. In addition, classes as small as 25 have been certified. *See Kreuzfeld, A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991) (finding that a class of 130 people satisfied the numerosity requirement, and acknowledging that classes of 25 and 30 had been certified in other courts).

Plaintiffs suggest that although they do not know the exact number or identity of all class members, there are thousands of individuals who could possibly fit into one of the three (sub)classes. Specifically, they point to the sheer volume of treated wood that exists in the United States, presenting that ninety-eight percent of the outdoor wood in the United States is treated with CCA, with over

30,000 tons of arsenic believed to be at large,[3] and that the wood preservative industry sells 6.5 million board feet of lumber annually.[4]

Defendants do not counter Plaintiffs' assertions with regard to the size of the putative class. Given the sheer number of potential plaintiffs and the fact that Defendants have not suggested that the putative class is insufficiently numerous, the Court determines that joinder would be impracticable in this matter.

## B. Commonality

■ Subsection 2 of Rule 23(a) requires that there be "questions of law or fact common to the class." To satisfy Rule 23(a)(2), the common questions need not be controlling; the proponent of certification need only show that the common questions of law or fact raise at least one significant common question. *See Georgia State Conf. of Branches of NAACP v. State of Georgia,* 99 F.R.D. 16, 25 (S.D.Ga.1983), *aff'd in part and rev'd in part on other grounds,* 775 F.2d 1403 (11th Cir.1985). This prerequisite is less rigorous than the Rule 23(b)(3) requirement that common questions of law or fact actually predominate over questions effecting only individual class members. The threshold for "commonality," then, is not high. *See Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 472 (5th Cir.1986), *reh'g denied* 785 F.2d 1034 (5th Cir.1986). *See McMahon Books, Inc. v. Willow Grove Assocs.,* 108 F.R.D. 32, 35 (E.D.Pa.1985). The requirement is satisfied when questions of law and fact linking the class members are substantially related to the resolution of the litigation, even though the individuals are not identically situated. *See Sanders v. Robinson Humphrey/American Express, Inc.,* 634 F.Supp. 1048, 1055 (N.D.Ga.1986).

Other courts have found commonality where, as here, all class members sought to resolve the issue of whether a product at issue was defective and caused the plaintiffs' harm. *See, e.g. Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 182 (4th

---

**3.** *See* Jeffrey Kluger, *Toxic Playgrounds,* Time Magazine, July 16, 2001, at 48.

**4.** *See* Alan C. Miller, *Fight Over Arsenic in Lumber Focuses on Public Awareness,* L.A. TIMES,

April 13, 2001 at A1. A "board foot" is a piece of lumber that is one foot wide, one foot long, and one inch thick, or its volumetric equivalent.

Cir.1993) (expressing concerns about manageability but finding that courts are receptive to certify asbestos classes because of "the commonality of asbestos' properties and characteristics, and to some extent, the similar ways in which asbestos products have been marketed and utilized"); *Deadwyler v. Volkswagen of America, Inc.,* 1986 WL 12567 (W.D.N.C.1986).

Even assuming differences between, and the possibility that harms will vary depending on the individual users and a raft of other conditions and circumstances, Rule 23(a)(2) does not require that the factual circumstances underlying the members' claims be identical. There need only be questions of law or fact that are common to the class as a whole. In this case, there are several significant common questions of law, and possibly some significant common questions of fact. Accordingly, Plaintiffs have met the relatively unburdensome standard for the commonality requirement.

### C. Typicality

According to the Third Circuit, typicality can be regarded as closely related to adequacy of representation-both look to the potential for conflicts within the class. *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.1996). Because the closest contested issues in this case deal with the possibility of conflicts between Plaintiffs and potential class members, many of the same arguments apply to both discussions.

■ Under Rule 23(a)(3), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Typicality will be found where the claims of the named representative bear the same essential characteristics as the claims of the class at large. *See Gomez,* 117 F.R.D.

at 400. Typicality thus prevents the representative's claims from being resolved on grounds that are not applicable to the other members claims despite the presence of common issues of law or fact. *See Vargas v. Meese,* 119 F.R.D. 291, 295 (D.D.C.1987).

■ To establish typicality, a plaintiff must show a nexus between its claims and the common questions of law or fact that unite the class. *See Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985). In *Kornberg,* the Eleventh Circuit elaborated on the typicality standard, stating that:

A sufficient nexus is established if the claims or defense of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of the other members of the class.

*Id.*

Plaintiffs fail to succeed on the typicality requirement in large part due to the individualized nature of Plaintiffs' and potential class members' injuries, and of the many highly involved inquiries that would be required to identify adequately the harms suffered. In short, there are few factual questions in this matter that would lend themselves to classwide treatment. Certification fails based on both the typicality requirement and the requirements of predominance and manageability under Rule 23(b)(3),[5] discussed briefly below.

5. Rule 23(b)(3) allows a class action to be maintained if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and

nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Establishing issues of predominance is far more demanding than Rule 23(a)'s commonality requirement. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997).

Two multiple-site property contamination cases provide a great deal of guidance for the Court. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 209 F.R.D. 323 (S.D.N.Y.2002); *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours & Co.,* 1994 WL 1251231 (S.D.Fla.1994). In *MTBE,* the plaintiffs, a group of private well owners, brought action against petroleum companies based on the alleged contamination of groundwater based on leaching of gasoline additives from underground pipes and storage tanks. Like Plaintiffs in this matter, the plaintiffs in *MTBE* brought claims for (*inter alia*) strict liability, negligence, and nuisance, and accused the defendants of both acting in concert through participation in trade organizations to suppress information about the harmfulness of the substance and trying to see to the product's continued proliferation in the market. *MTBE,* 209 F.R.D. at 331. The court found that the typicality requirement was not met in part because the contamination each plaintiff suffered came about "through a factually unique set of circumstances" ranging from the leaking from an underground storage system to a burst pipeline. *Id.* at 337.

Likewise, in *Dahlgren's,* Judge Hurley, on behalf of this Court affirmed a magistrate's denial of certification for a property damage class challenging Benlate, another pesticide. In that case, a nursery brought suit against a Benlate manufacturer on behalf of all other purchasers, arguing that at the time the Benlate left the manufacturer's hands, it was in such a defective state as to harm or destroy the plants to which it was applied. In denying certification, the Court found that unlike single-incident tragedies, more nebulous classes based on injuries that are spread out over a long period of time do not lend themselves well to class certification, in that no single set of operative facts establishes liability and no single proximate cause applies to each potential class member's injuries. *Dahlgren's,* 1994 WL 1251231 at *12.

In this matter, scant factual similarities beyond the mere purchase of treated wood exist between Plaintiffs and the presently unidentified body of class members. First, a great number of factors can contribute to whether (and to what extent) the CCA in treated wood can escape.[6] Also, at least three different CCA formulations are used, with varying levels of arsenic acid, chromic acid, and copper oxide.[7] These variations apparently exist to account for the different environmental conditions and intended uses of the wood.

Most importantly, the umpteen uses of treated wood and the diversity of climates to which the wood is exposed create great differences among the various Plaintiffs in this matter. Defendants identify some twenty-nine or more different types of outdoor wood structures, ranging from bird houses to decks, with twenty-seven of them featuring pressure-treated wood. *See* John R. Hauser Aff. at 13. Naturally, structures that are more exposed to the elements have a higher likelihood of leaching. In addition, as more frequently touched structures age, the risk of dislodge increases as exposed surfaces are worn. Even the horizontal or vertical orientation of wood can contribute to its leaching; horizontal structures, such as decks, will be more exposed to weather conditions and traffic and thus face a greater risk of dislodge or leach. *See* Cooper Dec. at 8.

---

6. One of the experts retained by Defendants postulates that even the part of the tree from which lumber was cut and the season in which the lumber was harvested can have an impact on leaching and dislodgeability. He suggests that heartwood, the older, nonliving central wood of a tree is more difficult to penetrate than the younger sapwood, resulting in more leaching and dislodgeability. He also states that the high sugar, starch, and nutrient content of red maple extractives in wood harvested in the summer and winter cause the wood to fix more rapidly than wood harvested in the spring or fall. *See* Paul Cooper Dec. at 5.

7. Defendants suggest that within the major formulations of CCA, a fairly large range of concentrations of chemicals exists. For example, arsenic levels in "CCA Type C," a commonly used CCA formulation, can range from 30 to 38% of the active ingredients, with chromium levels ranging from 44.5 to 50.5%, and copper from 17 to 21%. In addition, the assortment of formulations can be subject to varying levels of dilution with water as part of the treatment process; after dilution, the active ingredients in CCA Type C can range from less than 2 to 5% of the finished product. *See generally* Cooper Dec. Such ranges exist to account for the many uses of treated wood.

Further, as Defendants argue, the climate can also have a substantial impact on dislodging or leaching. This is particularly an issue in this matter, given that the named Plaintiffs could not be from three more geographically disparate locales within the United States. Wood located in areas of higher rainfall will tend to leach more, subject to differences in the intensity and content of precipitation. Further, greater acidity in precipitation may increase migration. Likewise, as wood begins to warp as a result of the very conditions that cause leaching, internal surfaces of wood will be exposed, thus facilitating the release of chemicals. Finally, wood that is permanently placed on wetter soil will have a greater tendency to leach than the same wood on drier land.

The above differences, among others, will present great difficulties in adjudicating the matter on a classwide basis. Judicial resolution of Plaintiffs' claim that leaching contaminates property (and poses a health risk) will require a great deal of site-specific and user-specific inquiries. First, identifying the source and origins of contaminants in soil will mandate a separate inquiry on each parcel of land at issue. Such inquiries will be complicated by, for example, variations from state to state in the natural background level of arsenic in the soil.[8] *See* Bowers Aff. at 21–22. A number of other variables exist, such as man-made variations in soil (*e.g.* fertilizer) and use specific conditions such as will impact the assessment of the harms. For instance, users are far less likely to have prolonged contact with a fence than with a deck or with playground equipment. In addition, the amount of soil affected by a bird feeder will be dramatically less than that affected by a deck of virtually any size. While it is entirely possible that leaching caused by all of these structures could cause some form of damage, assessing the damage in each case would require intense scrutiny of each potential plaintiff's property to a degree that would not be feasible. At a minimum, there

would need to first be an inquiry into the background level of the soil tested (assuming, of course, that the parties could agree on a method of testing). Next would then have to be a series of inquiries into, for instance, the size of the structure, the size of the area affected (which would likely depend in part on the size of the structure), the type of structure, and even possibly the type of treated wood. Such a calculus would need to be repeated for thousands of potential class members.

Similar reasoning was employed by the court in *MTBE*, which found that when the degree of contamination varies greatly from parcel to parcel, the nature and extent of mandatory relief will depend on site-specific examination. *See MTBE*, 209 F.R.D. at 350. In such matters, examinations will be necessary to determine the extent of contamination individually, as a result of myriad variables and characteristics. Despite the fact that all harms in this matter were caused by the same general body of products, there is no single accident or event that caused all of Plaintiffs' injuries.

The gravamen of many of the claims in this matter is the level of knowledge Plaintiffs individually possessed-whether the information in the CISs was adequate (or disseminated at all), whether Defendants were otherwise forthright about the possible risks, and whether Plaintiffs were adequately notified through some other means of the potential harms. The question of dissemination of information is more complex when applied to Home Depot, since, as revealed by Home Depot's counsel at oral argument, the company's management was decentralized until well into the 1990s (at least seventeen years into the class period). Given that store managers even within the same state bought their products from different manufacturers, the information that was available to consumers could have varied dramatically between stores. *See* Tr. at 117.

---

8. The "background level" of an element measures the concentration of the element in soil consistent with its natural occurrence. Bowers states that even *within* states, there exists great variation in the chemical constitution of soil. For example, she states that in Florida, the background concentration of arsenic can range from less than one to as high as fifty-two mg/kg, and the background concentration of chromium can vary from one to 150 mg/kg. (One mg/kg equals one part per million). *See* Bowers Aff. at 19–21.

In addition, in many cases, contractors and builders purchased treated wood on behalf of end users. According to Home Depot's Vice President of Merchandising for its lumber department, forty percent of Home Depot's treated wood product sales were made not to end users, but to professional customers, such as home builders, contractors, and construction professionals. See Roland Jarvis Aff. ¶ 11. *See also* Larry Sleep Dep. at 48 (stating that he relied on a "handyman" to purchase some of the wood for construction of a gazebo and part of a deck). The degree to which such intervening parties were warned of the risks of treated wood could have an effect on Defendants' culpability with regard to the actual Plaintiffs. *Cf. Rivers v. AT&T Tech., Inc.*, 147 Misc.2d 366, 554 N.Y.S.2d 401, 405 (N.Y.Sup.Ct.1990) (finding no liability to end users for bulk manufacturers of chemicals where "responsible intermediaries" could have provided product warnings). The fact that intervening parties may have provided injured parties with their own information and assurances about the safety of treated wood also contributes to the individualized nature of the harms in this matter. *See In re American Medical Systems, Inc.* 75 F.3d 1069, 1085 (6th Cir.1996) (recognizing in a case involving defective penile prostheses that, in addition to the fact that each plaintiff had a "unique" complaint and that the harmful products at issue had substantive differences, the fact that each plaintiff received different information and assurances from treating physicians contributed to the defeat of class certification).

"Knowledge" is highly individualistic and cannot be determined on a classwide basis. With a sea of (often confusing and conflicting) information and knowledge that consumers could have been given, and with only one of those sources being the handouts that were passed out by retailers *directly to* end users, there is no silver bullet in this case that would obviate the need for scores of "mini-trials" on the notice issue. As per Plaintiffs' misrepresentation claims, if it

could be demonstrated that an individual knew of the dangerous qualities of treated wood but bought and used it anyway, Defendants' representations or omissions could not be said to be the cause of the damage. In sum, a consumer's knowledge of the risks of treated wood would be tremendously important to whether a Defendant breached a duty to warn. By its very nature, knowledge is a highly personalized and individualized concept.

Two final issues in this matter reinforce the fact that Plaintiffs' claims are atypical and that class certification would be inappropriate. First, potentially hundreds or thousands of intervening parties (unconnected to this litigation) could have somehow handled the treated wood on its path from manufacture to ultimate use. For instance, the CIS contained information about the safe handling of sawdust from CIS-treated wood. Intervening acts of negligence from third parties such as the many contractors or builders who may have purchased the wood on behalf of end users could impact the extent of the injuries suffered by Plaintiffs.

Finally, difficulties in product identification would require detailed tracking of Defendants' practices leading to sale, and of Plaintiffs' purchasing choices. Defendants insist that formulators sell their chemicals to many different wood treaters,[9] and that there is no system in place for tracking which lots of preservative are used to treat particular lots of wood. *See* David Fowlie Aff., ¶ 4.

Defendant Home Depot claims that due to the difficulties presented by volume sales, there is no system for tracking purchasers of wood. Once the stock keeping unit ("SKU") tag is removed from a piece of wood, there is no way to determine whether a piece of wood was purchased from a Home Depot location, thus making it infinitely more difficult-if not impossible-to determine, solely based on product identification, which chemicals might

---

9. In fact, at oral argument, CSI's counsel stated that CSI does not license its treaters, and merely sells its chemicals to treaters, who buy wood from other sources and formulate it. Even if a Plaintiff were able to determine with certainty where he or she actually purchased the wood, an inquiry would be needed to determine first where the wood was treated, and then where it was formulated. *See* Tr. at 132–133.

be present in the wood.[10] *See* Roland Jarvis Aff. ¶ 18.

In light of all of the above factors, Plaintiffs' motion fails due to the lack of typicality of the Plaintiffs' claims.

### D. Adequacy of Representation

The final Rule 23(a) requirement is that the representative parties fairly and adequately protect the interests of the class. This inquiry concerns whether Plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and whether the plaintiffs have interests antagonistic to the rest of the class. *See Rink v. Cheminova*, 203 F.R.D. 648, 657 (M.D.Fla. 2001). The Court is not concerned by the question of whether Plaintiffs' counsel is competent to handle this case-Plaintiffs have demonstrated that they have obtained the services of rather capable and distinguished trial counsel.

Defendants argue that the named Plaintiffs are inadequate representatives because some class members may have claims for personal injuries, while the suit seeks certification for property damage only. Specifically, Defendants suggest that the two sets of claimants in this matter (i.e. the personal injury plaintiffs and the property damage plaintiffs) cannot share common representation, due to divergent interests.[11] In light of the numerous typicality and manageability concerns in this matter, the Court need not resolve this issue.[12]

**10.** Home Depot presents unique product identification issues due to its peculiar position in this case-it neither manufactures nor formulates treated wood, and despite being the only retailer named in this matter, only sells approximately fifteen percent of the treated wood sold in the United States (as of 2001). *See* Roland Jarvis Aff. ¶ 7. At oral argument, Home Depot's counsel theorized that homeowners could potentially have wood from any number of wood retailers on their property. *See* Tr. at 112–13. Thus, product identification in this matter would have to be multi-tiered; separate determinations would need to be made both of a piece of wood's chemical composition and provenance, and of its location of purchase. It would seem, then, that adequately identifying products would require placing the wood into one of at least three categories: wood that could be traced to its formulators/treaters and its retailer, wood that could be traced to its retailer but not its formulators/treaters, and wood that simply could not be traced. It is entirely possible that Plaintiffs would have many different types of wood on many different types of structures (and from many different retailers) on their property. As such, placing class members into one of three subclasses is not as simple as Plaintiffs argue. Even assuming, as Plaintiffs suggest, that individuals who could not identify at all where their purchases were made would be ineligible for membership in the class, placing the remaining individuals into one of the classes would prove troublesome.

**11.** In support of their claim splitting position, Defendants rely in part on *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir.1996). In that asbestos case, class action treatment was found improper in part because of the possibility of conflicts between plaintiffs who exhibited little to no injuries, and those who had suffered from lung cancer, disabling asbestosis, and mesothelioma. The court found that presently injured parties could not adequately represent plaintiffs who could potentially exhibit injuries in the future. However, despite the fact that the plaintiffs presented a number of legal theories, that case was brought primarily as a personal injury action, with all of the plaintiffs seeking to recover as a result of the physical harm and increased risk of harm they suffered from exposure to asbestos. Naturally, in such an action, the intraclass conflicts that would result from plaintiffs having vastly different personal injuries would be fatal to class certification based on inadequacy of representation. *See also Rink*, 203 F.R.D. at 664 (finding class representatives inadequate where parties had suffered "extremely varied types and degrees of illness or injury as a result of exposure.")

**12.** There are conflicting district court decisions and scant guidance from the courts of appeal on the issue of whether, by bringing an action that sounds exclusively in property damage, Plaintiffs have impermissibly split their causes of action, and whether any future personal injury actions stemming from treated wood injuries would forever be barred by *res judicata*. The Court notes, though, that it is most persuaded by *Eagle–Picher Indus. v. Cox*, 481 So.2d 517, 521 (Fla. 3d DCA 1985), which found that "the scope of property damage is often more quickly ascertainable than the scope of personal injuries, and it would be inequitable to force the subrogated insurer ... to force an injured party to bring a personal injury action before the extent of his injuries is known." Given the general indefiniteness of any "incident" that may have caused any of Plaintiffs' personal injuries, that any related personal injuries may not yet have manifested themselves, and may not for some time (if at all), and may not yet have even been "caused," it is difficult to see how such claims would be barred by the doctrine of *res judicata*. *But see Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 606 n. 16 (S.D.N.Y.1982) ("[i]t is difficult to imagine many

### E. Rule 23(b)

Finally, the class must satisfy one of the prerequisites of Rule 23. Courts have found that, despite the fact that failure to certify a class solely based on the determination that the class is not manageable is disfavored, *see In re South Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 423 (M.D.La. 1980), "the issue of manageability of a proposed class action is always a matter of justifiable and serious concern for the trial court and peculiarly within its discretion." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir.2001).

Class action treatment is not the superior method for handling this matter. A mass tort such as this cannot properly be certified without a prior track record of trials from which this Court would be able to draw the information necessary to make the predominance analysis required under Rule 23. Certification of an "immature" tort results in a higher than normal risk that the class action may not be superior to individual adjudication.[13] *See Castano v. American Tobacco Co.*, 84 F.3d 734, 747 (5th Cir.1996). Any savings in judicial resources in this case is speculative, and "any imagined savings would be overwhelmed by the procedural problems that certification of a *sui generis* cause of action brings with it." *Id.* at 739.

In light of the potential manageability problems in this matter, Plaintiffs' suggestion that certification would preserve judicial resources is based merely on speculation. With the universe of outcomes for this type of litigation still largely unknown, it would be not appropriate for this Court to make a blind guess as to the matter's manageability. As the Fifth Circuit wisely stated in *Castano*, eschewing a theoretical approach to the man-

ageability question, "[n]ot every mass tort is asbestos, and not every mass tort will result in the same judicial crisis." *Id. See also Rink*, 203 F.R.D. at 663 ("The theory that isomalathion/malathion exposure enhances the risk of contracting a serious latent disease is even less tested in the courts than in the laboratory.")

In addition, the Manual on Complex Litigation makes a similar point against certification of immature torts:

> Fairness may demand that mass torts with few prior verdicts or judgments be litigated first in smaller units-single-plaintiff, single-defendant trials-until general causation, typical injuries, and levels of damages become established. Thus, "mature" mass torts like asbestos or Dalkon Shield may call for procedures that are not appropriate for incipient mass tort cases, such as those involving injuries from new products, chemical substances, or pharmaceuticals.

Manual For Complex Litigation (Third), § 33.26 (1995). While the Court is well aware that there is nothing "new" about treated wood or the possible harms it may create, there simply is no guidance from any source as to the proper conduct of a treated wood class action suit.

## IV. Conclusion

Based on the fact that the class representatives' claims would be atypical of other potential members of the class, that individual issues of fact and law would predominate in this matter, and that class action treatment would not be the superior method of resolving this dispute, it is accordingly

---

courts sanctioning separate actions for property and injury claims arising out of the same incident"). In short, the very issues regarding the length and scope of the class period that defeat certification on the typicality issue also suggest that future injury actions might not be barred by *res judicata*.

**13.** For instance, even in spite of the seventy year history of treated wood's use in this country, there is no track record of cases in which plaintiffs were alleging property damage as a result of treated wood. And there is no indication that a

sea of litigation over treated wood is imminent. John R. Hauser, Ph.D., an expert hired by Defendants, stated that "[o]ver 80% [of pressure-treated wood users surveyed] say they are not likely to tear down the structure or ask for their money back." Hauser Aff. at 15. Until plaintiffs decide to file individual claims, a court cannot, from the existence of injury, presume that all (or even a slight few) will pursue legal remedies. With no demonstration from Plaintiffs that class certification would be ideal, and no similar cases from which to seek guidance, class certification would be improper in this matter.

ORDERED AND ADJUDGED that Plaintiffs' Motion for Class Certification (DE # 233) is hereby DENIED.