Eula Guidry ARDOIN, et al.,

v.

STINE LUMBER COMPANY, et al.

No. 02–CV–2502.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

March 17, 2004.

Hugh E. McNeely, Eulis Simien, Jr., Jimmy Simien, Simien & Simien, Luther F. Cole, Justice, Baton Rouge, LA, Jack C. Watson, Mark A. Delphin, Lake Charles, LA, James Michael Messer, Levin Papantonio et al., Pensacola, FL, Richard Lewis, James Pizzirusso, Cohen Milstein et al., Washington, DC, for plaintiffs.

Charles B. Bice, Winnfield, LA, James R. Nieset, Plauche' Smith & Nieset, Thomas J. Solari, Woodley Williams et al., Thomas M. Bergstedt, Brian Wade Arabie, Bergstedt & Mount, John S. Bradford, William B. Monk, Stockwell Sievert et al., Charles N. Harper, Swift Spears & Harper, Lake Charles, LA, Scott E. Delacroix, Jeffrey E. Richardson, Ann Redlich Koppel, Adams & Reese, New Orleans, LA, Robert L. Shuftan, David A. Kanter, Brent R. Austin, Anne Kimball, Anthony Hopp, Michael Blankshain, Leo Dombrowski, Lucy Lisiecki, Barry Blonien, Rebecca Alfert, Wildman Harrold et al., Chicago, IL, John P. MacNaughton, Seslee S. Smith, Robert P. Alpert, Morris Manning & Martin, Atlanta, GA, Richard C. Stanley, Bryan C. Reuter, Jennifer L. Thornton, W. Raley Alford, III, Stanley, Flanagan & Reuter, LLC, New Orleans, LA, Theodore V. H. Mayer, Robb W. Patryk, Renee C. Redman, Hughes, Hubbard & Reed, LLP, New York City, for defendants.

## MEMORANDUM RULING

MINALDI, District Judge.

Before the court is a Cross–Motion to Strike Class Allegations and Deny Class Certification [doc.# 136] filed by the defendants ("Arch Wood"). The plaintiffs ("Ardoin") filed an opposition [doc.# 193], and the defendants filed several replies and notices of supplemental authority [docs.# 148, 152, 153, 154, 195, and 200].

Oral arguments were granted, and the parties appeared before the court on February 18, 2004 [docs.# 203 and 204] to supplement the evidence and arguments in favor of their respective positions on whether the plaintiffs' cause should be certified as a class action. The parties were ordered to provide supplemental evidence to support their positions, and they have done so [doc.# 205, and currently undocketed response]. This matter is fully briefed and argued and ready for disposition.

### Facts

The plaintiffs file this suit following the discovery that wood that they purchased from various retailers contained a product referred to throughout this suit as "CCA". The CCA product used to treat the wood contains chromium and arsenic as active ingredients. These carcinogenic and mutagenic chemicals are believed to leach from the treated wood and contaminate nearby surfaces and users of the wood products.

The defendants dispute these claims and the dangers posed by the wood. They allege that it produces minimal risk to safety, especially when compared to the benefits that it provides.

### Procedural History

This matter was removed from state court, and this court ruled that removal was proper. The plaintiffs attempted to dismiss their suit, but the defendants objected that it would be improper due to the procedural history of the case. The court agreed, and dismissal was not granted. While the issues of removal and dismissal were being adjudicated, the instant motion was delayed.

### Law and Analysis

The plaintiffs aver in paragraph 17(a) of their Fifth Supplemental and Amended Petition for Damages:

WHEREFORE, plaintiffs, reiterating all of the allegations and prayers of the prior petition except as amended herein pray for judgment on behalf of themselves and the Class as follows:

A. Ordering that the action be maintained as a class action under Louisiana Code of Civil Procedure Article 591 and appointing plaintiffs, SHERAL LAVERGNE, JASON M. BROUSSARD, PAUL ANTHONY FOUNTAINE and PATRICK CUNNINGHAM, and their un-

dersigned counsel of record and any additional Class representatives necessary to adequately represent the Class.

The defendants have moved to strike the allegations regarding the class action, and they simultaneously move to deny class certification to the plaintiffs. At the outset, the court recognizes that there are two motions at issue. One is to strike the allegations, as provided by Rule 12(f), and the second is to move for the determination of whether a class should be certified, as provided by Rule 23.

The right of the defendants to move for a determination of class certification is supported by *Gore v. Turner*, 563 F.2d 159 (5th Cir.1977). Under Rule 23, the court also has the obligation to reach this determination, on its own motion, if necessary.

The new Rule 23(c)(1)(A) provides, "[w]hen a person sues or is sued as a representative of a class, the court must—at an early practicable time—determine by order whether to certify the action as a class action."

Even the old Rule 23(c)(1), which was modified during the pendency of this suit, required that, "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."

The plaintiffs have limited the scope of the defendants' motion from an inquiry as to whether a nationwide class should be certified to one of whether a Louisiana class should be certified. This limitation comes as a result of the plaintiffs' admission that:

Given the adverse and binding authority in the Fifth Circuit, however, Plaintiffs concede that the allegations in their Complaint seeking a nationwide class certification should be stricken. However, because Defendants have not and cannot meet their burden in seeking to strike *state only class allegations*, Plaintiffs contend that this Court should deny Defendants' Motion to Strike in regards to a limited-state only class. *See [doc.# 193, pp. 3–4].*

The plaintiffs contend that the defendants have two principle arguments against class certification: that the myriad of state laws make it impractical to have a class and that the immense individual differences between the leaching properties and risks posed by pieces of wood make a class logistically difficult to have. Since the plaintiffs have narrowed the scope of their proposed class to only cover Louisiana litigants, the first argument is moot. However, the second argument is resolved in favor of the defendants.

### Motion to Vacate State Court Ruling

In determining what evidence to consider in reaching this conclusion, the court must first resolve the defendants' Motion to Vacate the State Court Ruling [doc.# 25 and # 197]. The plaintiffs point out that Judge Canaday issued an order on December 4, 2002, prior to removal, which estopped the defendants from arguing that "lack of uniformity" is a bar to class certification. *See Exhibit "A" to Plaintiffs' Opposition to Defendants' Cross–Motion to Strike Class Allegations, [doc.# 193], Written Reasons on Objections to Report and Recommendation of Special Master on Plaintiffs' Motion to Compel Production of Documents, Dec. 4, 2002, pp. 2–3.*

This court has a duty to "make an independent review of the factors necessary for class certification, and to evaluate how the relevant evidence would be adduced at a trial." *Id.* at 5, *citing Castano v. American Tobacco Co.,* 84 F.3d 734, 744–45 (5th Cir.1996).

This duty complies with a plain reading of the requirements of Rule 23, which mandates an independent determination of whether class action certification should be maintained. Thus, the court finds that the recognition of a previous court's suppression of evidence would prevent this court from making an informed and reasoned decision as required by *Castano* and Rule 23. Therefore, the evidence produced in the record is relevant and admissible for purposes of determining whether to certify this class action.

### The Class Certification Factors

Thus, the court has considered all submitted evidence to establish whether the plaintiffs should be allowed to proceed as a class. The criteria for certifying a class action is a showing by the proponent that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are

questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Rule 23(a)*.

Additionally, in order to maintain the class action, it must be shown that:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. *Rule 23(b)*.

Thus, at the onset, the court must determine whether there is sufficient numerosity, commonality, typicality, and fair and adequate class representation by the attorneys and parties at bar and whether one of the three criteria in Rule 23(b) exists.

A similar case has already been adjudicated in the Southern District of Florida, *Jacobs, et al. v. Osmose, Inc., et al.*, 213 F.R.D. 607 (S.D.Fl.2003), where that court determined that the plaintiffs filing suit against parties involved in the manufacture and distribution of CCA tainted wood could not establish a class because they failed to meet several of the criteria required by Rule 23. Taking each of the factors of section (a), we find that the plaintiffs fail to establish the grounds for certifying a class of Louisiana plaintiffs.

### Numerosity

■ The plaintiffs allege that it would be impractical to join all of the members of the purported class without certification. To meet the numerosity requirement of Rule 23(a)(1), it is not necessary for the plaintiffs to establish the exact number of potential class members or to individually identify these persons. However, the number of potential class members must be so numerous as to make joinder of all of these persons impractical. Plaintiff alleges that the putative class consists of potentially hundreds of thousands of present and past home and business owners in Louisiana who purchased CCA treated wood.

Like the *Jacobs* court, this court finds that the alleged number of plaintiffs is substantial. Therefore, the court finds that the plaintiffs have met their burden with respect to the numerosity requirement.

### Commonality

■ To satisfy the commonality requirement, the plaintiffs must show that there are "common questions of law or fact among the class members." The courts have determined that the burden of satisfying this element is light, and it is not required that all questions of law and fact raised by the dispute be common, only that they be linked by a common complaint. The Fifth Circuit has said that "the commonality requirement is met when there is 'at least one issue whose resolution will affect all or a significant num-

ber of the putative class members.'" *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993) quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir.1982); *Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir. 1993).

Commonality, as contemplated by *Forbush* and Rule 23, requires only a generalized showing. The potential class members in the instant case share many elements of their causes of action. All own the allegedly defective products that prompted the law suit, and all have an interest in resolving the question of whether they are entitled to compensation or remediation because of their ownership.

The plaintiffs point out numerous scientific and legal areas of commonality between the parties. For instance, their experts contend that exposure places all of the potential plaintiffs at risk for cancer. *See testimony of Dr. John Rosen, and Dr. Richard Maas, and Consumer Product Safety Commission, Fact Sheet—Chromated Copper Arsenate (CCA)—Treated Wood Used in Playground Equipment.* But as the defendants point out, the purported class would be suing on the basis of defective products, not personal injury.

Initially, the defendants alleged that the variations in state law was a factor preventing commonality of questions of law. The plaintiffs have since narrowed the scope of their potential class to plaintiffs in Louisiana, thus rendering that issue moot.

But the individualized nature of these claims still prevents the simultaneous resolution of all or a significant portion of the potential class's complaints. Furthermore, since there is variation in wood, soil, usage, and environmental conditions, it is almost impossible to claim that the class members truly share common issues of fact, because some pieces of wood may pose more of a potential threat than other pieces.

The defendants also have individualized defenses against each plaintiff. For instance, some plaintiffs hired contractors to construct structures with CCA treated wood. These contractors may be partly liable in subrogation for failure to warn of the risks of CCA. Other plaintiffs purchased the wood themselves and were aware of but assumed the risks of the CCA treatment or even disobeyed safety warnings about it, bringing up the possibility that the defendants should be entitled to credit for the comparative fault of the plaintiffs.

Some of the plaintiffs may also allege that they suffered physical injury from the wood. Even among those not alleging physical injury, there are some who will demand compensation for environmental remediation and others who will also want to be paid for the diminished value of their homes. Some will expect no compensation, and there will be many combinations of these scenarios. As the potential class members' claims are examined closely, the common links between them dissipate into many distinctive categories.

While the resolution of this matter as a class will settle, for some purported class members, the question of whether they are entitled to a remedy for defective products under La.C.C. Art 2524 and 2475, it will leave virtually every other question, including the appropriate measure of damages and the existence of defenses, unresolved. Because of this, the plaintiffs cannot satisfy even the light burden of showing at least one issue whose disposition will resolve the claims of a significant number of the class members.

### Typicality

The plaintiffs do not succeed with regard to the typicality requirement. Rule 23(a)(3) requires that the representative plaintiffs possess claims which are typical of the class. In essence, it is necessary for them to possess the same interests and suffer the same injuries as the proposed class, *Heartland Communications, Inc. v. Sprint Corp.* 161 F.R.D. 111, 116 (D.Kan.1995). Like the commonality requirement, the typicality requirement does not pose a demanding standard. *See Forbush*, 994 F.2d at 1106.

The record reflects that both parties have thoroughly researched their cases and submitted extensive exhibits containing testimony from scientists who are experts in a variety of fields. This evidence has been helpful to the trier of fact in determining the degree

of typicality between the proposed plaintiffs' claims.

The plaintiffs have provided the court with a history of the class representatives' involvement in this suit, explaining when they purchased their lumber and for what purpose they used the lumber. But they fail to show that these circumstances, and the degree of exposure that the class members would receive, are typical.

There is no question that the plaintiffs have shown that there are risks to being exposed to the active ingredients in CCA treated wood. *See Poisonwood Rivals*, p. 1 (Nov.2001), *All Hands on Deck*, p. 4, *Consumer Product Safety Commission Fact Sheet—Chromated Copper Arsenate (CCA)—Treated Wood Used in Playground Equipment, attached as plaintiffs exhibit 16, 15, and 14 to their February 27, 2004 post-hearing submission.* The plaintiffs also submit evidence attempting to show relative predictability of the leaching process, in an effort to connect the dangers of these chemicals to the defendants' products in a manner which would show that the wood in question was defective. But in the end, the plaintiffs are unable to meet their burden.

Specifically, the defendants have shown that the plaintiffs' complaints are individualized based on at least 17 variables established in the defendants' initial cross-motion [doc.# 136] and throughout the testimony.

The defendants attach numerous affidavits and copies of studies in support of their position. For instance, the Affidavit of Teresa S. Bowers, Ph.D. begins by explaining that soil has significant variations in the naturally occurring background chemicals found in treated wood. These variations, combined with 5,000 years of arsenic distribution by humans in the production of tools, ornaments, pigments, cosmetics, glass, agricultural and ranching activities, and medicines, makes it difficult to know where arsenic in a given plot of soil has come from. For instance, Dr. Bowers notes that, in southern states, high arsenic concentrations occur near former "cattle dip vats" where arsenic-containing pesticides were applied to livestock in the early 1900s. *See Bowers affidavit, p. 19, Exhibit 26, Appendix 1 to Defendants' Joint Memorandum in Opposition to Class Certification and in Support of Cross–Motion to Strike Class Allegations, [doc. # 136, Exhibit Group 3 of 6].* Significant variations are also found between neighbors and even within a single homeowner's yard, due to varying landscaping habits of homeowners 50 years ago, when they applied arsenic-based pesticides to their yards. *Id. at 23.*

Even before accounting for human activities, natural background concentrations of arsenic vary nationwide from 1 to 97 mg/kg; concentrations for chromium vary from 1 to 2,000 mg/kg; and concentrations for copper vary from 1 to 700 mg/kg. Certain types of soil and rocks are more likely to harbor these substances because of their physical characteristics. *Id. at 19.* In Louisiana alone, background concentrations vary from 1.3 mg/kg to 32 mg/kg of arsenic and 7 to 100 mg/kg of chromium. *Id. at 21.*

In addition to the difficulties in establishing an origin for any existing arsenic, soil and environmental characteristics affect the likelihood that it will stay in one place. Dr. Bowers notes that:

> The range of chromium, copper, and arsenic concentrations measured under and near CCA-treated wood structures provide evidence of the variability that can arise from the effect of these chemical processes on any constituents leached from CCA-treated wood. No simple theoretical model will allow prediction of expected concentrations of these constituents in soil associated with CCA-treated wood structures. Even if measurements of relevant soil characteristics, as described above, is carried out, the interpretation of the resulting data would remain difficult in the face of uncertainty over how the combination of all these factors effects stability, mobility, and hence, concentration. *Bowers affidavit, p. 2.*

Dr. Bowers further explains the significance of each of these environmental variables, which include the soil pH, Redox potential (oxygen in soil), precipitation, complexation (the ability of dissolved CCA to form chemical bonds with other dissolved soil constituents), adsorption (ability

of CCA to adhere or bind to soil particles), and competition (presence of chemicals that can displace CCA). *Id. at 25.* Dr. Bowers summarizes these variables into four general types of phenomena "that govern the fate of arsenic, chromium, and copper in soil, and thus affect the magnitude of potential exposure." *Id. at p. 16.* These four factors are: chemical form, spatial availability, physical availability, and biological availability in soil.

Even erroneously assuming a consistent chemical response to CCA-treated wood, Dr. Bowers explains that individual human exposure will depend on another lengthy set of criteria, including the amount of time spent outdoors, the type of clothing work, etc. She concludes that,

Although arsenic, chromium, and copper may be present in soils as a result of the impact of CCA-treated wood, the extent to which CCA-treated wood as a source contributes to a measurable impact of these elements above their natural background levels varies from property to property, and is dependent on a host of chemical factors. Generalizations about the contribution of CCA-treated wood as a source of arsenic, chromium, and copper in soil cannot be made. *Id. at 61.*

The defendants have also submitted an affidavit by Harry Clewell, an environmental consultant, who testified that there are numerous variables which go into determining how much of the CCA product a person would be exposed to, even assuming that the environment distributed CCA uniformly. *See Clewell affidavit, Exhibit 32, Appendix 1 to Defendants' Joint Memorandum in Opposition to Class Certification and in Support of Cross–Motion to Strike Class Allegations, [doc.# 136, Exhibit Group 3 of 6].*

Dr. Paul Cooper testified that factors such as the treatment method, type of wood being treated, part of the tree from which the lumber was cut, species of source wood, season when the lumber was harvested, size, shape, and condition of the lumber when treated, type of CCA formulation and concentration of solution used for treatment, fixation method used, climate where the wood is used, amount and nature of precip-

itation, acidity of precipitation, type of surface water to which wood is exposed, type of structure built out of wood, size and location of lumber on the structure, use of the structure, existence and amount of sawdust, length of time in service, and presence of surface treatments, all play a role in determining the amount of CCA which leaches from the treated wood into the soil.

Dr. Cooper summarizes his testimony, noting that:

... there are many individual variables and conditions which can affect the amounts of CCA constituents either leaching or dislodging from preserved wood. Wood is a natural organic substance and no two pieces of CCA treated wood are identical and no two structures are the same. Soil concentration and availability of CCA constituents for exposure to individuals may vary by several hundred-fold depending upon the variables discussed below. *See Cooper affidavit, p. 1, Exhibit 24, Appendix 1 to Defendants' Joint Memorandum in Opposition to Class Certification and in Support of Cross–Motion to Strike Class Allegations, [doc.# 136, Exhibit Group 3 of 6].*

The defendants supplemented this scientific testimony with that of toxicologists and other experts, all of whom substantiated the conclusion that determining the amount of and risk of exposure from CCA treated wood is a highly specialized and individualized undertaking which does not make it susceptible to class certification.

The plaintiffs present evidence in favor of their position that there are unifying facts which make the class claims typical of each other. But their evidence is not as persuasive or thorough. For example, one of their foremost arguments is their claim that the Environmental Protection Agency has banned CCA treated wood, thus treating all CCA wood as one category of product, regardless of its ultimate destination and use.

But a close reading of the EPA materials offered by the plaintiffs reveals that wood treaters voluntarily stopped producing CCA wood because they now have a new treatment available. The site specifically notes

that, "EPA announced a *voluntary* decision by industry to move consumer use of treated lumber products away from a variety of pressure-treated wood that contains arsenic by December 31, 2003, in favor of new alternative wood preservatives." [emphasis added], http:// www.epa.gov/pesticides//factsheets/chemicals/cca_transition.htm.

Thus, a class of products were not singled out for regulatory sanctions. Instead, an industry chose to transition to a new technology. Furthermore, even if CCA wood had been banned because of its safety, this evidence still does not provide proof of typicality between claimants whose wood has already been installed. The EPA specifically says that it "has not concluded that CCA-treated wood poses any unreasonable risk to the public or the environment." and specifically advises consumers *not* to "replace or remove existing structures made with CCA-treated wood or the soil surrounding those structures." *Id.* Rather than support the plaintiffs' position, this document undermines it. Counsel's argument about "what was really going on" is unsupported by the evidence.

Therefore, only some wood which was sold is likely to leach, and the EPA has advised consumers not to take any special precautions with their existing structures. The evidence shows that even with a thorough excavation of each class member's home or business to determine which wood has leached and which wood is likely to leach, and in what quantities, and even with a detailed history of the site, including its former uses and weather conditions since the installation of the wood, it would be difficult or impossible to determine the extent of contamination caused by CCA treated wood.

Thus, it cannot be said that all of the wood belonging to the purported class members is defective, and it cannot even be readily determined which, if any, pieces of wood are defective. Therefore, the claim of each of the potential class members is significantly different from other members.

### Adequate representation

■ It must be determined whether the class representatives will fairly and adequately represent the class members. Rule 23(a)(4). This requirement is met when the interests of the class representatives are not in conflict with the interests of the class members and when counsel for the representative plaintiffs are qualified to conduct litigation as a class action.

The court has no reason to question the qualifications or abilities of the plaintiffs' counsel. As demonstrated from their tireless legal pursuits, competent arguments, and extensive discovery, they are capable attorneys who are dedicated to their cause.

However, the defense notes that because "absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." (Doc.# 136, p. 36, citing *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 480 (5th Cir.2001)).

The defendants allege that the plaintiffs' counsel are conducting this litigation without fully considering the interests of the class. As evidence for this allegation, they point out that:

> ... plaintiffs' claims have been split and re-split solely in service of obtaining class certification. Specifically, plaintiffs disavow and waive all tort claims—even though the unjust enrichment and UCC claims they assert are not cognizable in some jurisdictions. They further disavow and waive all personal injury claims and many aspects of their property contamination claims—such as any claim for diminished property value.

These concerns are valid, and despite their assurances, the plaintiffs fail to demonstrate that they will fairly and adequately represent the class members under the present litigation arrangement. For instance, the doctrine of *res judicata* would forever bar the personal injury claims of those who allege that they are injured by treated wood, subjecting them, instead, to the limited damages allowed under the present cause of action. It is this disparity of claims that prevents the plaintiffs from meeting the commonality requirement, and it is the consequences of not

467

recognizing the disparity of these claims that prevents the class members from adequately representing the class.

**The factors in Rule 23(b)**

■ In addition to satisfying the four criteria found in Rule 23(a), the plaintiffs must also satisfy one of the requirements of Rule 23(b). They purport to satisfy the third of those requirements, which reads:

> The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

For the reasons already discussed, the court finds that there is a significant variation in the questions of fact among the members. Since only a small percentage of the potential class members are likely to claim that they suffer ill-effects of the CCA exposure, their individual interests will vary considerably from those of the class.

Even with respect to the plaintiff's predominant purpose, to seek a contractual claim for defective products, it cannot be said that the products owned by every potential class member are defective. Indeed, treated wood which has not been exposed to water, treated wood made of certain kinds of trees, treated wood which has come in contact with certain types of soil, treated wood purchased in different batches, as well as a variety of other variables—all provide questions affecting individual members rather than members of the class as a whole. Therefore, a class action is not the superior method for adjudicating this dispute.

### Conclusion

Despite lengthy and well-plead arguments, the plaintiffs have failed to show that they meet the burden of proving the requisite commonality, typicality, and adequate representation requirements of Rule 23(a) or any of the criteria of Rule 23(b).

The denial of class action status is in keeping with the Southern District of Florida's determination in *Jacobs* and in keeping with established law in the Fifth Circuit. Accordingly, the defendants' Motions to Vacate the State Court Ruling [docs.# 25 and # 197] will be granted, and the defendants' Cross–Motion to Strike Class Allegations and to Deny Class Certification [doc.# 136] will be granted.